"D.W. Robinson, an attorney at law in State of South Carolina, would respectfully show to the honorable Supreme Court of the State of South Carolina, by way of information and petition:
"1. That petitioner is an attorney at law duly licensed by this honorable Court, resident and practicing in the State of South Carolina.
"2. That John T. Duncan is also an attorney at law duly *Page 462 
licensed by this Court, residing in Richland County, in this State, and practicing law in said State.
"3. That on the 21st day of December, 1900, the said John T. Duncan, as attorney for Ella Taylor, received the sum of $250 from one M. Frank, which moneys were loaned by said Frank to said Ella Taylor upon the faith and security of a mortgage of real estate given by said Ella Taylor at the same date, to wit: December 21st, 1900.
"4. That said loan was made to said Ella Taylor for the purpose of paying the purchase price of the real estate mortgaged, which purchase price was to be paid to Ella Mitchell.
"5. That the loan was made by said M. Frank to said Ella Taylor upon the faith and representations as to the title and covenants in regard thereto, which were the usual covenants of title, contained in said mortgage; `and upon the further positive statements and representations of the defendant, John T. Duncan, who drew and prepared the note and mortgage, that the title to the said lot was all right, was complete, and was in the defendant, Ella Taylor.'
"6. That the title to said real estate was not at that time, had not been at any time prior thereto, and has not been at any time subsequent thereto, in said Ella Taylor; `and this the defendant, John T. Duncan, knew at the time of negotiating and obtaining the said loan and money.'
"7. That said money, to wit: $250, was paid by said M. Frank to and was received by John T. Duncan, as attorney for Ella Taylor, `for the purpose of being paid and applied on the purchase price of the said lot; and said John T. Duncan received the said money with full knowledge of the purpose for which the same was loaned to Ella Taylor, and paid to him.'
"8. That the said money was never applied by said attorney to the uses and purposes for which the same was received, but `was placed in the Bank of Columbia, S.C. and was by him (John T. Duncan) checked out and used for his own purposes,' and said money was never paid either to Ella Taylor or Eliza Mitchell. *Page 463 
"9. That after the said note and mortgage became due, demand was made by said M. Frank upon said John T. Duncan for the payment of said money, which payment was refused; that thereupon said M. Frank instituted an action in the Court of Common Pleas for Richland County against `Ella Taylor, John T. Duncan and Eliza Mitchell,' for the recovery of the said money; a copy of the complaint in which action marked exhibit `A,' a copy of the answer of John T. Duncan marked exhibit `B,' a copy of the report of the master marked exhibit `C,' a copy of the exceptions of defendant, John T. Duncan, marked exhibit `D,' a copy of the order of his Honor, O.W. Buchanan, confirming the master's report marked exhibit `E,' and a copy of the order of the Honorable Geo. W. Gage, marked exhibit `F,' are hereto annexed, and hereby referred to and made a part of this information and petition, and reference is here made to the same for a full particular knowledge of the terms and facts and circumstances of the said matter.
"10. That the facts stated in the foregoing petition and information are based upon the findings of facts by the master, John S. Verner, in the action entitled `M. Frank v.
Ella Taylor, John T. Duncan and Eliza Mitchell,' which action is above referred to.
"11. That the report of the master was duly confirmed by his Honor, O.W. Buchanan, Circuit Judge, on the 23d day of April, 1902, and said report was made the order of the Court, and the said John T. Duncan was, by the order of the said Circuit Judge, directed and required to pay said money, to wit: $250, and interest from May 8th, 1901, into this Court within ten days from the date of said order; to which said order said John T. Duncan signed his consent.
"12. That said John T. Duncan failed to comply with the order of his Honor, Circuit Judge O.W. Buchanan; and his Honor, Geo. W. Gage, after issuing a rule to show cause, and after due notice, on the 12th day of May, 1902, adjudged said John T. Duncan in contempt of Court for failure to pay said money, in accordance with the order of his *Page 464 
Honor, O.W. Buchanan, Circuit Judge, and ordered and directed the imprisonment of said John T. Duncan until he complied with said order of Circuit Judge O.W. Buchanan, or until the further orders of the Court.
"13. That the said moneys were not paid by said John T. Duncan until after the order of his Honor, Judge Gage, and until after he had received notice of said order of Judge Gage, and said moneys were paid, as petitioner is informed and believes, by said John T. Duncan on the 13th day of May, 1902, in the evening.
"Wherefore, your petitioner submits to this honorable Court, that said John T. Duncan, by reason of the facts and matters above set forth, has been guilty of deceit, malpractice and conduct unbecoming a lawyer, and that he should be disbarred from further continuance in the practice as an attorney and counsellor at law."
(Verified.)
The return of John T. Duncan is as follows:
"Johin T. Duncan, Esq., respondent, who upon the verified information and petition of D.W. Robinson, Esq., has been required by order of his Honor, Y.J. Pope, senior Associate Justice, presiding, served upon respondent on 19th May, 1902, to show cause before this honorable Court on 2d June, 1902, at 10 o'clock A.M., why he should not be removed and disbarred, and why his name should not be stricken from the roll of attorneys of this Court, makes answer to the statements made in the information upon which such rule was issued, and respectfully submits the same as his return to the rule to show cause in this proceeding:
"1. Respondent admits the allegations contained in the 1st, 2d 12th and 13th paragraphs of the petition.
"2. Respondent denies each and every other allegation in the petition except such as are admitted by the statements made in the following paragraphs of this return.
"3. For some years prior to the summer of 1900, respondent *Page 465 
had been attorney for a colored woman of Columbia, S.C., named Ella Taylor, and as such had represented and served her in several matters, for which he had charged and received as fees proper compensation.
"4. Some time after 13th August, 1900 (according to respondent's best recollection it was 18th October, 1900), said Ella Taylor brought to respondent a letter from one Eliza Mitchell to Ella Taylor, wherein the writer stated her willingness to sell a lot of land on Laurel street, in Waverly, just east of Columbia, for $350 cash, and said Ella Taylor informed respondent that she would accept the offer, and employed him to examine the titles and prepare the necessary papers, and assist her in making the purchase.
"5. Respondent proceeded to make an examination of the title, and found that no deed was of record conveying the title of this lot to said Eliza Mitchell, but that her deceased husband, Frank Mitchell, had gone into possession more than twenty years before under a contract to purchase from one Latta Johnston or his mother; that the greater part of the purchase money had been paid, but a small unpaid balance of about $25 was still claimed; that Latta Johnston was dead and his mother had predeceased him, and his rights were controlled by his widow, who was represented by W.H. Lyles, Esq., an attorney of this city.
"6. Respondent stated these facts to Ella Taylor, and on 4th December, 1900, wrote to Eliza Mitchell and informed her of the status of her title. Respondent also learned that Frank Mitchell had died intestate, leaving as his heirs at law, his widow, Eliza, and a son, named Edward.
"7. By letter dated 5th December, 1900, respondent was informed by Eliza Mitchell that she wished him to get everything straight for her, and he was shown letter by the same woman to Ella Taylor, saying she did not know of the Johnston claim, but was willing for it to be satisfied out of the purchase money of the lot.
"8. At this time, respondent was seeking to get a title deed from Mrs. Johnston to the heirs of Frank Mitchell, and *Page 466 
was willing and offered to pay the $25 claimed to be the balance due. It seemed to be the opinion of Mr. Lyles that the full payment and long possession of Mitchell would give good title to the heirs of Mitchell; but respondent wanted a deed, and, therefore, had prepared a proper deed and left it with Mr. Lyles for execution, which respondent certainly expected to have executed, as that was his understanding of conversations had with Mr. Lyles.
"9. Respondent was informed by Ella Taylor that she would get the $350 from M. Frank. On 21st December, 1900, Ella Taylor brought Frank to respondent's office, when the whole matter was discussed, but no mention made, as respondent can now recall, of the amount to be loaned. Respondent then and there fully informed both Ella and Frank that to have good titles it would be necessary to get title from Mrs. Johnston to the heirs of Mitchell, which he had prepared and left with Mr. Lyles and expected soon to get back again, and that the heirs of Mitchell must then make deed to Ella Taylor, and that the money would not be paid until these deeds were delivered. Later, on same day, respondent was with Ella Taylor in Frank's store, and he then learned that Frank would lend Ella $250 (but no more) without interest, and Ella was required to otherwise raise the remainder. Respondent agreed to help Ella raise the remainder. After being so informed, Frank instructed respondent to draw note and mortgage from Ella Taylor to M. Frank, and he would pay over the money. Said Frank and respondent both expected the money to be used in perfecting this title, and both knew that the title was not then in Ella Taylor.
"10. Respondent then returned to his office, at once drew note for $250 and mortgage (the mortgage containing the usual general warranty clause). These papers were properly executed by Ella Taylor, and she and respondent went together to Frank's store. Frank read these papers, and then gave to respondent a check for $250, and asked respondent to give him a receipt setting out the facts as to the *Page 467 
title as before stated; whereupon respondent gave to Frank the following statement and receipt, which was introduced in evidence in the case of Frank v. Taylor et al.: `Columbia, S.C. December 21st, 1900. This is to certify that I have examined and traced title to the lot mortgaged by Ella Taylor to M. Frank, and that some days since drawn deed to same and delivered same to Wm. H. Lyles, Esq., for signature of his client, and having had the mortgage and note for $250 to M. Frank drawn and properly executed, I hereby acknowledge the receipt of check from him on the Bank of Columbia for $250. John T. Duncan, attorney for Ella Taylor.'
"11. Soon thereafter respondent arranged with Ella Taylor for a second mortgage for $162.50, which included $12.50 for discount and recording fees and $150 in money, which he was to negotiate for her; thus realizing $400, of which $350 was to be for the purchaser of the lot and $50 to himself as compensation for his services. And in part security for this second mortgage debt Ella Taylor gave to him her note, indorsed for $112.50 by one McDougal. But by reason of events subsequently occurring, this second mortgage and the McDougal note were never used.
"12. Very soon after receiving Frank's check for $250, respondent drew the money thereon and went with it to Mr. Lyles' office and offered to pay him the $25 for Mrs. Johnston's deed, but did not get it. There followed delays caused by respondent's inability to get deed. On 19th February, 1901, respondent by letter advised Eliza Mitchell of the delays.
"13. Respondent did not keep this $250 separate and apart from his own private funds, and as a result thereof he did use the same along with his other funds, but he was at all times able, with cash in hand or on short notice, and on the security of his individual assets, to raise and replace the amount and properly disburse it in payment for the lot.
"14. After advertisement in a small evening paper of this city, which advertisement respondent never saw, this lot of *Page 468 
land was sold for unpaid taxes by the secretary of State on first Monday of April, 1901, of which sale respondent had no notice until after sale was completed. He then made efforts to acquire title from the purchaser at such sale by repayment of bid and costs, but said purchaser refused to yield his tax title.
"15. Before that time, however, Frank had demanded this money of respondent, which he then refused to return, as Eliza Mitchell had rights therein prior to said tax sale, and after such sale he offered to refund if Frank would allow to Ella Taylor the amounts which she had paid to Frank, as stated by Ella Taylor, in part repayment of this loan, which Frank refused to allow.
"16. On May 23, 1901, two actions were commenced in the Court of Common Pleas for Richland County, one of which was by M. Frank, plaintiff, against Ella Taylor, John T. Duncan and Eliza Mitchell, defendants, and the other by Ella Taylor, plaintiff, against John T. Duncan and Eliza Mitchell, defendants, to restrain this respondent from paying out this money, and demanding that he account for same. In both of these cases, respondent, by order of Associate Justice Pope, was enjoined from paying out this money.
"17. The action instituted by Ella Taylor was discontinued some time after 16th November, 1901, upon her allegation that she had never authorized it, but the other action was referred to the master, who made his report on January 29th, 1902, in which were several findings of fact, based, respondent alleges, upon testimony which was untrue, which reflected severely on this respondent, which findings are largely quoted in the information filed in this Court by D.W. Robinson, Esq., and upon which findings the allegations of the petition are based. To all of these findings of fact, respondent duly excepted.
"18. This case being reached for trial in the Circuit Court in April last, respondent felt that judgment would be given against him for the repayment of this $250 to Frank (Ella *Page 469 
Taylor having in her testimony made no claim to any part thereof), and he, therefore, said to Mr. Robinson that he would consent to a proper order confirming the master's report. Thereafter, on the same day, Mr. Robinson sent to respondent a proposed decree of confirmation, the first order in which read as follows: `That the report of the master, his findings of fact and his findings and conclusions of law, be, and the same is hereby, in all things confirmed and approved.' Deponent intended only to consent to an order directing him to pay the money; and so, when this proposed order was sent to him to affix his name to the consent, he returned the proposed original and wrote to Mr. Robinson a note (of which he has no copy), declining to sign his consent unless the words which carried an approval of all the master's findings, were left out. The same order was then returned to him for signature, with the words `his findings of facts and his findings and conclusions of law,' plainly erased. Deponent then took his pen and further erased the words `be and the same' and `in all things,' and then signed the consent. So that this order, as consented to by him, read: `That the report of the master is hereby confirmed and approved.' And respondent declares that he never intended by this action of his to admit the correctness of any finding of the master beyond his conclusion that respondent should pay to Frank this $250.
"19. Respondent readily agreed to the ten days' limit fixed by Judge Buchanan's order, for he felt sure of his ability to make full payment within that time; but he was delayed partly by his unavoidable absence from home for three days and partly by the bank from whom he expected to get the money, and by whom it was promised before this absence and from whom he did get it.
"20. On 13th May, 1902, he made full payment of debt and costs to J.F. Walker, clerk of Court, who thereafter paid principal and interest to D.W. Robinson, Esq., attorney for M. Frank.
"21. Respondent believes that the exhibits to the information *Page 470 
are correct copies, except that the copy of Judge Buchanan's decree is incorrect in the particulars shown in paragraph 18 of this return.
"22. And respondent reiterates his denial of all improper and unprofessional conduct on his part, charged in the information, and of any intentional wrong-doing, unless the same can be found in the true narrative contained in the foregoing return.
"Wherefore, respondent prays that this return be held to be a full and satisfactory return and that the proceedings be dismissed."
The report of the master in case of M. Frank v. Ella Taylor, John Duncan and Eliza Mitchell is as follows:
"To the honorable Court of Common Pleas for Richland County, spring term, 1902:
"The above entitled action having been referred to me by his Honor, R.C. Watts, presiding Judge of the Fifth Circuit, by his order dated at Columbia, S.C. November 16th, 1901, `to take the testimony and report the same with the findings of law and fact, and any special matter herein to this Court,' I held reference on January 8th, 9th, 22d and 23d 1902, respectively, after due notice to the attorneys for the respective parties. The plaintiff was represented by his counsel, D.W. Robinson, and the defendant, John T. Duncan, was present in his own behalf and as attorney for Eliza Mitchell, at each of the said references. The defendant, Ella Taylor, filed no answer in this cause, but was present in person at the several references, and testified as a witness in behalf of the plaintiff herein. On January 23d 1902, the taking of testimony was closed, both sides having announced that they had introduced all the evidence they respectively desired, and the case was then argued by counsel for both sides. The testimony was taken by consent in stenographic notes, and the reading and signing thereof waived; and a typewritten copy thereof is filed and transmitted with this report to this honorable Court. *Page 471 
"At the opening of the reference on January 8th, 1902, Mr. D.W. Robinson moved to strike out and disallow the answer of the defendant, Eliza Mitchell, in this cause, and for judgment for want of an answer, against said Eliza Mitchell, upon the grounds: (1) That said answer is not a denial of the allegations of the complaint, and raises no issue. (2) That said answer is unverified; and filed his notice of motion which had been previously served on John T. Duncan for himself and Eliza Mitchell.
"Mr. Duncan excepted to the passing upon that question at this time because the notice was to appear before the Circuit Judge; and noted his exception to the overruling of the answer of Eliza Mitchell.
"I ruled that: (1) The answer is not a proper denial under the Code; (2) and it is not properly verified. To this Mr. Duncan, attorney for defendant, excepted. Mr. Duncan moved for leave to amend the answer, and leave to amend was granted, provided he filed the answer within ten days from that date (January 8th, 1902). But no other or amended answer was filed within the ten days allowed, or within any other time up to the date of the final hearing and up to the date of making this report, either with the master or to his knowledge.
"From the evidence taken in this cause, I find the following facts:
"1. That the defendant, Ella Taylor, in February, 1900, entered into negotiations with the defendant, Eliza Mitchell, for the purchase from Eliza Mitchell and her son, Frank Mitchell, of that lot situate in the city of Columbia, and mentioned and described in paragraph 5 of the complaint, and agreed to purchase said lot at the price of $350; and the defendant, John T. Duncan, was employed as and acted as the attorney and adviser for said Ella Taylor in examining the title, preparing the same, and making and executing the mortgages hereinafter mentioned, and negotiating the loans hereinafter mentioned; and that after December 5th, 1900, the said John T. Duncan also acted as the attorney for *Page 472 
Eliza Mitchell and Frank Mitchell in regard to the same lot and the perfecting of the title thereto, and conveyance thereof.
"2. That in order to pay the purchase money for the said lot, plaintiff, M. Frank, agreed to and did, on the 21st day of December, 1900, loan to Ella Taylor, through her said attorney, John T. Duncan, the sum of $250, and took as security therefor the note of said Ella Taylor for said sum, payable ninety days after date, without interest, and for further security took the mortgage of Ella Taylor on the said lot; the said note is filed with the evidence and marked `exhibit A,' and the mortgage is likewise filed with same evidence and marked `exhibit B;' and to raise the balance of the said purchase money said Ella Taylor executed a second note, with one McDougal as surety or indorser, and gave a second mortgage on said lot, for the sum of $112, which second note was afterwards surrendered and released by said John T. Duncan, not having been used, upon the demand of said McDougal, upon the discovery of the worthlessness of said security.
"3. That the loan made by plaintiff and the money furnished by him, to wit: $250, was furnished and paid to the defendant, John T. Duncan, as attorney for the defendant, Ella Taylor, and same was received by said John T. Duncan as her attorney for the purpose of being paid and applied on the purchase price of the said lot; and said John T. Duncan received the said money with full knowledge of the purpose for which the same was loaned to Ella Taylor and paid to him.
"4. That the said loan was made by plaintiff to said Ella Taylor, upon the faith and security of the mortgage of the said lot mentioned in the pleadings and in said mortgage; and upon the faith and representations as to the title, and the covenants in regard thereto, contained in the said mortgage; and upon the further positive statements and representations of the defendant, John T. Duncan, who drew and prepared the note and mortgage, that the title to the said lot *Page 473 
was all right, was complete and was in the defendant, Ella Taylor.
"5. That the title to said lot was not in the said Ella Taylor, was not good or complete, at the time the said loan was made, and at the time the money was paid to and received by the defendant, John T. Duncan, attorney for the defendant, Ella Taylor; and this the defendant, John T. Duncan, knew at the time of negotiating and obtaining the said loan and money; and the said defendant, Ella Taylor, did not have, on the 21st day of December, 1900, at the time of executing said note and mortgage, and at the time the said $250 was received by the said defendant, John T. Duncan, as her attorney, either the title or right to possession of said lot mentioned in the pleading and in the mortgage; and the said defendant, Ella Taylor, has not had either the title or the right to possession of said lot, at any time either prior to said 21st day of December, 1900, or subsequent thereto.
"6. That the said lot was sold as delinquent lands, by the sheriff of Richland County on salesday in April, 1901, under execution from M.R. Cooper, secretary of State, and U.X. Gunter now has possession thereof, claiming from and under said sale, and so far as the evidence in this case discloses, the title is outstanding in said U.X. Gunter.
"7. That the said sum of $250, loaned by plaintiff to defendant, Ella Taylor, as set forth in the foregoing findings numbered 2, 3 and 4, respectively, was received by the defendant, John T. Duncan, by check, was placed in the Bank of Columbia, S.C. and was by him checked out and used for his own purposes; and said sum of money was never received by the defendant, Ella Taylor, in her own person; and said sum of money was never received by Eliza Mitchell or Frank Mitchell; and said money was never applied or used for the payment of the purchase money of the said lot or any part thereof.
"8. That no part of the said loan of $250, so made by plaintiff to Ella Taylor, as set forth in the foregoing findings, *Page 474 
numbered 2, 3, 4 and 5, respectively, has been repaid to plaintiff, M. Frank, but same and every part thereof is still due and owing to said plaintiff.
"9. That after the said note and mortgage became due, and after the plaintiff had discovered, upon inquiry, the condition of his note and mortgage security, to wit: on the 8th day of the month of May, 1901, and before the commencement of this action, the plaintiff made demand on the defendant, John T. Duncan, for the return and repayment to him of the moneys, to wit: the $250 loaned by him as aforesaid, and the said defendant refused to pay or refund said moneys.
"I find as a conclusion of law:
"1. That the said moneys, to wit: $250 loaned by the plaintiff to Ella Taylor and received by the defendant, John T. Duncan, as set forth in the foregoing findings of facts, were received by said defendant, John T. Duncan, as attorney and trustee for the defendant, Ella Taylor; and the object and purpose for which the loan was made and the trusts upon which and for which money was loaned and paid having entirely failed of execution, the plaintiff has a right to recover the said fund of the defendant, John T. Duncan; and that said defendant, John T. Duncan, should be required to pay said fund, with interest thereon from May 8th, 1901, into this Court for the use and benefit of plaintiff, and should also be required to pay into this Court the costs of this action."
The decree of Judge Buchanan confirming the master's report is as follows:
"This cause being heard by me upon the report of the master herein, and upon motion of D.W. Robinson, attorney for the plaintiff, the defendant, John T. Duncan, for himself and as attorney for Eliza Mitchell, being present and consenting, and the defendant, Ella Taylor, having failed to appear and file answer or demurrer in this cause, it is considered, ordered and adjudged by the Court: *Page 475 
"That the report of the master be and the same is hereby in all things confirmed and approved, and made the order of this Court.
"That the defendant, John T. Duncan, be and he is hereby ordered, directed and required to pay into this Court, to the clerk thereof, within ten days after the date of this order, for the use and benefit of the plaintiff, the sum of $250, with interest thereon from May 8th, 1901, together with the costs of this action; the said costs to be paid in accordance with the statement thereof to be furnished by said clerk to said John T. Duncan at any time he requests the same.
"That the clerk of this Court be and he is hereby authorized to pay to the plaintiff or his attorney the sum above directed to be paid into this Court when so paid, for the use and benefit of said plaintiff, and that said clerk pay the said costs, so paid into his office under this order, to the respective parties to whom the same is due."
September 2, 1902. The opinion of the Court was delivered by
This proceeding comes up on information and petition in the original jurisdiction of this Court. The petitioner, D.W. Robinson, Esq., is a member of the bar of South Carolina, as is also the respondent, John T. Duncan, Esq. Mr. Robinson charges that Mr. Duncan "has been guilty of deceit, malpractice and conduct unbecoming a lawyer," in certain matters of professional business placed in his hands. He, therefore, prays that Mr. Duncan "be disbarred from further continuance in the practice as an attorney and counsellor at law." *Page 476 
This forum has not been made familiar with proceedings of this character. So far as the writer of this opinion is aware, this is the first petition of the kind which has been preferred at the bar of this Court. Such proceedings, fortunately, very few in number in this State, have usually been instituted in the Circuit Courts. But there is no question concerning the jurisdiction of this Court, and we have no hesitation in entertaining the petition.
There is another feature of this case which is somewhat novel — the proceeding was instituted by only one member of the bar, who is the sole petitioner, acting in his individual capacity. It has been customary in cases such as this to call a meeting of the members of the bar to which the respondent belongs, and in a proper case, after due and thorough deliberation on the accusations brought against him, to select one or more brethren of that bar to institute proceedings for disbarment. By this usual method charges against a respondent are more thoroughly sifted; the serious step of moving to disbar is only taken when a majority of the respondent's brethren of the bar are satisfied that his name should be stricken from the roll of attorneys; and the proceeding is happily relieved of all suspicion of personal or private animosity and prejudice. We do not wish to be understood to condemn the course pursued by Mr. Robinson in this case nor to question the purity of his motives; we simply wish to indicate the more commendable method. We know of no previous deviations except when an attorney general or a circuit solicitor moved for the disbarment of an attorney who had been convicted of a felony or an infamous offense, submitting the record as the ground of the motion.
The petition in this case was submitted on the 19th May, 1902. On motion of Mr. Robinson, a rule was issued forthwith, requiring Mr. Duncan to show cause on the 2d June. "why his name should not be stricken from the roll of attorneys." On that day the respondent made his *Page 477 
return, and a hearing was had. It appeared from the petition and the accompanying exhibits that the accusations of deceit and malpractice and unprofessional conduct brought against Mr. Duncan were based upon matters arising in two suits in the Circuit Court in which Mr. Robinson and the respondent had been opposing counsel; and especially upon the findings of fact in a report of the master of Richland County filed in one of these cases. It would overload this opinion to embody those records. But we ask the Court Reporter to set out in his report the petition, the return, the master's report and the order of his Honor, Judge Buchanan, confirming that report. It is enough in this opinion to state briefly the main grounds relied on by the petitioner. He charges that the respondent, Mr. Duncan, as the attorney of one Ella Taylor, received from one M. Frank, the sum of $250, as a loan made upon the faith and security of a mortgage of real estate given by Ella Taylor at the time of the loan. That the loan was made for the purpose of paying the purchase price of the lot of land mortgaged. That the loan was made upon the positive statements of the respondent, Mr. Duncan, that the title to the mortgaged lot was in Ella Taylor and that it was a good title. That the title never was in Ella Taylor, and that the respondent, Mr. Duncan, knew this when the loan was made. That the money was paid to Mr. Duncan, as Ella Taylor's attorney, for the purpose of being applied to the purchase price of the lot, and that he received the money with full knowledge of that purpose. That the money was never so applied, but was placed by Mr. Duncan in bank, and was by him checked out and used for his own purposes. That when the note and mortgage became due and demand had been made and refused, an action for the recovery of the money was brought. That the master, to whom the matter was referred, found the charges made to be true, and reported Mr. Duncan liable for the amount, with costs. That Mr. Duncan consented to an order confirming the master's report, which was signed by Judge Buchanan, said order requiring *Page 478 
him to pay the amount due into Court within ten days. That Mr. Duncan failed to comply with this order. That thereafter, upon a rule to show cause, issued by his Honor, Judge Gage, Mr. Duncan was adjudged in contempt of Court, and ordered to be imprisoned until he complied with the terms of Judge Buchanan's order. That the money, though paid by Mr. Duncan, was not paid until after Judge Gage made the order already referred to. That by reason of these various facts and matters, John T. Duncan has been guilty of deceit and malpractice and conduct unbecoming a lawyer, and that he should be disbarred.
To these grave charges the respondent in his return made an emphatic denial as to all that accused him of improper or unprofessional conduct or of any intentional wrong doing. He denied that he had made any false or deceitful representations as to the title to the land. He admitted having mixed and used the money borrowed from Frank with his own in the bank, but claimed that he was able at any time to replace the same. He claimed that the several damaging findings of fact contained in the master's report were based upon testimony which was untrue, and that to all of them he had duly excepted. He claimed that when the proposed decree confirming the master's report was submitted to him, he consented only to an order directing him to pay the money; that he, therefore, returned the original to Mr. Robinson, with a note stating that he declined to subscribe his consent unless the words confirming and approving the master's findings of fact were left out; that Mr. Robinson then erased the words "his findings of fact and his findings and conclusions of law," and sent the decree back to the respondent, who, before signing it, took his pen and erased the words "be and the same," and also the words "in all things." The concluding words of the decree had originally read, "That the report of the master, his findings of fact and his findings and conclusions of law, be and the same is hereby in all things confirmed and approved." As signed by Mr. Duncan, after the erasure referred to, the *Page 479 
order, he declared, read: "That the report of the master is hereby confirmed and approved;" and he claimed that he never intended by his consent to admit the correctness of any finding of the master beyond his conclusion that he, the respondent, should pay Frank the money.
When the petition and the return had been read, the petitioner, Mr. Robinson, proposed to offer in support of his accusations not only the pleadings in the actions in the Circuit Court, and the report of the master and the order confirming the same, but also the testimony taken in writing before the master upon which his findings of fact were founded. Counsel for the respondent objected to the introduction of that written testimony, and claimed for their client that he was entitled to see the petitioner's witnesses face to face at the hearing, that they might be examined and cross-examined in the presence of the Court; and that he might, if necessary, adduce testimony in rebuttal. The Court very properly allowed this claim, taking the reasonable view, which is well sustained by authority, that in proceedings for disbarment it is not safe to rely upon testimony taken before a referee or master, or any other tribunal, but that the Court or Judge that hears the petition should also hear the witnesses examined in the presence of the respondent. In such proceedings the Court or Judge decides the issues of fact as well as of law, and to do so satisfactorily and in justice and fairness to the attorney accused, the same opportunity should be given which is given to a jury to determine the credibility of witnesses by observing their demeanor as well as by hearing what they say (see Fowler v. Finley, 30 Fla., 331 S.C. 18 L.R.A., 405, and cases cited). Besides, in this case the respondent had pleaded in his return that the master had based several of his findings of fact upon untrue testimony. That this rule is a wise and salutary one was clearly shown in this very case when, under the cross-examination of the respondent's counsel, two of the petitioner's witnesses, M. Frank and Ella Taylor, varied materially in the statements they *Page 480 
made before this Court from what they had said before the master as to what occurred at the execution of the note and mortgage.
This decision of the Court to hear oral testimony caused a suspension of the hearing until the afternoon of the next day, when the hearing was resumed and witnesses were examined on both sides. At the conclusion of the arguments the Court reserved its decision until the next morning, when the following short order was filed: "It is the judgment of this Court, that the prayer of the petition herein be refused, and the said petition dismissed. The reasons for this judgment will be filed hereafter. Y.J. Pope, senior Associate Justice, presiding. 3d day of June, 1902."
We shall now proceed to state the reasons for the foregoing judgment. Proceedings in disbarment have been and still are of very rare occurrence in the annals of the bar of South Carolina. One can tell perhaps on the fingers of one hand all the instances of similar accusations on record in our Courts. This is greatly to the credit of the legal profession of this State, showing that the high standards of honor and integrity appropriate to the profession of the law have been maintained by the lawyers of South Carolina with extremely few exceptions. This deservedly high reputation should be jealously preserved. It is the duty of the brethren of the legal profession throughout the State, those on the bench as well as those at the bar, to uphold the good name of the South Carolina lawyer and guard it with jealous care. It has been the just pride of the legal fraternity from the earliest days that theirs is an honorable profession as well as a learned and liberal profession. As far back as the days of Edward the First of England, the Statute of Westminster enacted that if any sergeant, barrister, pleader or other, do any manner of deceit or collusion in the King's Court, or beguile the Court or a party and be thereof attained, he shall be imprisoned for a year and a day, and from thenceforward shall not be heard to plead in that Court for any man. From that time to the *Page 481 
present day the legal fraternity has exercised the right in a proper case to accuse a brother of unprofessional conduct or of dishonorable practices, and to demand, if he be a Judge, his removal by impeachment; if he be a lawyer, his dismissal by the Court. Nor should Courts hesitate to order disbarment in a case made out, not by way of punishment so much as by way of showing that the man whom they have admitted into the ranks of an honorable brotherhood has proved himself unworthy of his high calling, and that his name should be expunged from the roll of attorneys, which can only thus be justly regarded a roll of honor.
Of great importance to the bench and the bar, the disbarment of an unworthy brother is of hardly less importance to the public at large. It is to the dearest interest to a layman that the lawyer he employs should not only be a man learned in the law, but also a man of honor and uprightness of character. The client places himself in his lawyer's hands when it may be his life, his liberty or his property is at stake. In business difficulties and in family troubles he confides in his legal counsellor, and imparts to him information which he would not dream of giving to any other. It is all important to the layman, therefore, that his attorney should be a man of honor as well as a man of law. Not for literary embellishment, but because of its peculiar appropriateness and as embodying the sound and sensible views of a learned lawyer and a high judicial officer, Sir Walter Scott, we make the following extract from The Antiquary. He puts the words in the mouth of his hero, the Laird of Monkbarns: "In a profession where unbounded trust is necessarily reposed there is nothing surprising that fools should neglect it in their idleness, and tricksters abuse it in their knavery. But it is the more to the honor of those — and I will vouch for many — who unite integrity with skill and attention, and walk honorably upright where there are so many pitfalls and stumbling blocks for those of a different character. To such men their fellow-citizens may safely entrust the care of protecting their patrimonial rights, and their country the *Page 482 
more sacred charge of her laws and privileges." The Antiquary, vol. 2, cap. 43.
When a Court is asked to exercise its summary jurisdiction over an attorney to the extent of expelling him from the profession, as in the case before us, it is proper to consider what the Courts have the right to require of a lawyer. All the books and authorities that treat of this subject agree that the three main requisites are learning, diligence, integrity; but that the greatest of these is integrity. Ignorance of law and neglect of business may keep a lawyer in the lowest ranks of his profession, and render him liable in damages to his clients for any loss caused thereby; but such would afford no ground for disbarment. But the man who is lacking in integrity and who does not deal honestly and fairly with his client, the Court and the other party, but who practices deceit, or fraud, or dishonesty, or overreaching craft, no matter how learned and diligent he may be, is unworthy of his profession and should be disbarred. It has, therefore, been held that the Court may strike the name of an attorney from the rolls for fraudulent conduct, although it may not be so gross as to be criminally punishable (United States v. Porter, 2 Cranch (C.C.C.), 60). Gross misconduct is always good and sufficient ground for disbarment — Tidd, 60; State v. Holding, 1 McCord, 238, and cases therein cited. But the case must be clear against the attorney, not only as to the act charged, but that it was committed with a bad or fraudulent motive — State v. Finley, 18 L.R.A., 412, and cases cited. This is all the more necessary, because, though a proceeding such as this is, strictly speaking, a civil one, yet it is highly penal and in the nature of a criminal forfeiture in its possible consequences — 6 Ency. Pl. Pr., 709, note and cases cited. "The consequences of striking an attorney from the roll are so severe, both in degrading him in the eyes of the community and in depriving him of the means of living to which he may have devoted most of his mature life, that Courts have taken that step only when the misconduct of the attorney might properly *Page 483 
be characterized as gross." Re Carl Lentz, 50 L.R.A., 415. We read, on the other hand, in 2 Chitty's Practice, 33, that in cases of mistake, even upon a point of practice and in cases of negligence, the Court will not interfere summarily against an attorney. "But when an attorney has been guilty of a want of integrity, then * * * the Court will interfere summarily." The same wholesome doctrine is laid down in 1 Tidd's Pr., 85, where the author quotes from Lord Mansfield.
We shall now consider and determine whether the evidence in the case at bar justifies the conclusion that the respondent, Mr. Duncan, was guilty of gross misconduct and should, therefore, be disbarred. The petitioner, Mr. Robinson, charges generally, but only inferentially, that Mr. Duncan was "guilty of deceit, malpractice and conduct unbecoming a lawyer." But Mr. Robinson specifically charges that when the money was borrowed from M. Frank, and the note and mortgage were executed, Mr. Duncan knew that the mortgagor had no title to the land, and yet he, as the mortgagor's attorney, assured the mortgagee that the title was good. If this were established by the testimony, it would certainly amount to fraudulent and gross misconduct such as would clearly justify the Court in striking his name from the roll. The testimony fell far short of proving this charge. True, the master had found it proved and had so reported, but the witnesses upon whose testimony he based his findings, namely, Frank, the mortgagee, and Ella Taylor, the mortgagor, so contradicted themselves and each other when examined before this Court, that this charge — much the most serious charge made — fell to the ground.
The accusation that Mr. Duncan failed to keep his client's money separate from his own in bank, but that he checked it out and used it for his own purposes — this the respondent admitted to be true, but asserted that he was always ready and able to raise and replace the amount. Such conduct in an attorney may be and is, we think, reprehensible for its *Page 484 
laxity, but it is not necessarily fraudulent, and it does not furnish ground for disbarment. This has been distinctly held by the English Courts in the case of Guilford v. Sims, 76 E.C.L., 369.
Great stress was laid by the petitioner on the fact that Mr. Duncan, the respondent, consented to the decretal order confirming and approving the master's report, which, it will be remembered, had in effect found as a matter of fact that Mr. Duncan had committed fraud and acted deceitfully. The petitioner seemed to interpret the respondent's consent as equivalent to a plea of guilty of fraud and deceit. Mr. Duncan's consent, if nothing else appeared to explain it, would certainly amount to a most damaging admission. But the record and the testimony abundantly prove that he did not consent until the order was so modified in his opinion by erasures that it did not confirm and approve all the master's findings of fact, but only the finding and conclusion that the respondent should pay Frank the money. The respondent's uncontradicted testimony on this point was not a little corroborated by a statement made by the petitioner, Mr. Robinson, in open Court at the hearing. It corroborated Mr. Duncan's testimony that the erasures were made before the report was confirmed. The intention of the respondent in having the erasures made was stated by him in his testimony, and when we consider the statement made by Mr. Robinson, we see no reason for disbelieving Mr. Duncan's account of the matter. "A consent order is the mere agreement of the parties under the sanction of the Court, and is to be interpreted by an agreement" — Allen v. Richardson, 9 Rich. Eq., 56; Jones Parker v. Webb, 8 S.C. 206. And such an agreement is certainly binding in the principal cause, and the consenting parties would be estopped from showing the motive or the intention in that cause. But they would not be estopped in another cause, especially one penal in its nature, from showing the motive and intention of the consent, and thus prevent its being regarded as a conclusive admission *Page 485 
of guilt. We have thus disposed of the three gravest accusations brought by the petitioner against the respondent. Having decided them in favor of the respondent, we see no reason for taking up and considering at length the charges of lesser weight. It is enough to say that in our opinion the petitioner failed to make out a case for the order of disbarment prayed for. The testimony signally failed to prove that gross misconduct or want of integrity on the part of Mr. Duncan, which should be clearly proved before a Court is justified in striking an attorney's name from the roll. And, therefore, as already stated, this Court immediately after the hearing filed its judgment, that the prayer of the petitioner be refused and the petition be dismissed. It is not improper to add that, while pronouncing judgment against the petitioner, we are as far from condemning his action in this matter as we are from commending the conduct of the respondent. We are satisfied that Mr. Robinson brought his petition believing that as a member of an honorable profession it was his duty so to do. And we hope that Mr. Duncan's unenviable experience in this proceeding will prove a warning, especially to the young members of the bar, so as to acquit themselves as attorneys at law as to avoid even the appearance of evil.
MESSRS. WM. CHRISTIE BENET and J.H. HUDSON sat asAssociate Justices in place of CHIEF JUSTICE McIVER, sick,and JUSTICE GARY, disqualified.